A07A2432, A07A2433. LA QUINTA INNS, INC. et al. v. LEECH et al.; and vice versa.

(658 SE2d 637)

ELLINGTON, Judge.

On May 21, 2004, John Leech jumped or fell to his death from the window of a seventh-floor room at a La Quinta Inn. Carol Leech, Mr. Leech's surviving spouse and the representative of his estate, brought this wrongful death action against La Quinta Inns, Inc., LQ Management, LLC, La Quinta Corporation (collectively "La Quinta"), and Linda Cotton.[1] The trial court denied in part the motion for summary judgment filed by La Quinta and Cotton, and we granted their application for interlocutory appeal. Mrs. Leech filed a cross-appeal from the trial court's ruling that the evidence of record demands a finding that Mr. Leech committed suicide. For the reasons that follow, we affirm in part and reverse in part.

To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered

---

[28] *Taylor v. State,* 181 Ga. App. 199, 200 (2) (351 SE2d 723) (1986).

[1] Mrs. Leech sues Cotton in her capacity as La Quinta's employee and agent.

immaterial. Further, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.

(Citations and punctuation omitted.) *Sudduth v. Young*, 260 Ga. App. 56, 57 (1) (579 SE2d 7) (2003).

[O]n appeal from the denial or grant of summary judgment[,] the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

Viewed in the light most favorable to Mrs. Leech, the record shows the following undisputed facts. Before his death, Mr. Leech had lived in Room 322 of the hotel for about six months while separated from his wife. On May 20, 2004, Mr. Leech had dinner with his girlfriend, his adult son, James Leech ("James"), and his long-time friend, John Rivera; James and Rivera were both in town to attend the high school graduation of Mr. and Mrs. Leech's daughter, Ashley Leech ("Ashley"). After dinner, the group decided to go to a nearby bar. Ashley and her boyfriend met up with the group in the bar's parking lot. When Ashley saw her father with his girlfriend, she became upset and confronted her father about his affair.

Mr. Leech returned to the hotel shortly after midnight and had a brief conversation with Cotton, who was managing the front desk that night. Cotton was the only hotel employee on duty at the time and the only hotel employee with whom Mr. Leech interacted that day. About ten minutes later, Mr. Leech returned to the front desk to book a room for Rivera. Because he specifically requested a smoking room, Cotton gave him a room on the seventh floor, where all of the hotel's smoking rooms were located. During this transaction, Mr. Leech and Cotton had a friendly conversation about Ashley's graduation the next day and his friend's visit. According to Cotton, Mr. Leech was calm and cheerful when he left the front desk.

James and Rivera also went to the hotel after they left the bar. They arrived at approximately 1:05 a.m. and asked Cotton for Mr. Leech's room number. Cotton advised them that she could not give out

room numbers but would call Mr. Leech's room and inform him of their presence. She tried to contact him at Room 322, but there was no answer, so she then called him at Room 721, the room that he had just engaged. Mr. Leech answered the phone, instructed Cotton not to give out his room numbers, and told her that he would call his son on his cell phone.

Mr. Leech called James on his cell phone at approximately 1:10 a.m. Mr. Leech invited his son up to his room, but James declined, saying that he and Rivera had other plans for the night. James testified that at approximately 1:13 a.m., after a few minutes of "normal" conversation, his "father began talking strangely and [James] became concerned that [Mr. Leech] was threatening to harm himself." Specifically, Mr. Leech told James "he was sorry for some of the things that had happened" and asked James to "tell the family he was sorry." James told him he could do that himself, and Mr. Leech responded that "he wouldn't be here." At that point, James covered his cell phone and told Rivera to get help because his father was talking about harming himself. Rivera demanded that Cotton give them Mr. Leech's room number, summon hotel security, and call 911 because he was threatening to harm himself.

For the next several minutes, James continued his conversation with Mr. Leech, in an effort to keep him on the telephone until help arrived. James testified that his father was calm, that he joked with him, and that he talked excitedly about Ashley's graduation party, his grandchildren, and his plans to move to Florida. Believing that Cotton was "dragging her feet," James yelled at her to "Stop f—ing around and get us the room number or get help." Mr. Leech overheard James' demand and told his son, "it would be over before [he] got [there]," and then the call ended.

Cotton called 911 at 1:27 a.m. At 1:34 a.m., two police officers arrived at the hotel. When they arrived, the officers asked Cotton where Mr. Leech was. Cotton was on the telephone and did not respond immediately. After that delay, Cotton told the officers that Mr. Leech stayed in Room 322, that he had just rented Room 721, and that she did not know which room he was in. She did not mention that, when she had last spoken with Mr. Leech, he was in Room 721. The officers and Rivera went to Room 322; James went alone to Room 721. As James approached Room 721 at 1:38 a.m., he heard his father talking on the phone. James knocked on the door, and, after getting no response, he kicked the door open. No one was in the room. James looked through the open window and saw his father's body on the ground below. There is no direct evidence regarding whether Mr. Leech jumped or fell to his death.

According to Mr. Leech's wife, his son, and his daughter, Mr. Leech had no history of depression or threats of suicide. The hotel

staff knew Mr. Leech well from his long residence there. The record contains no evidence that any employee at La Quinta observed any unusual or suicidal behavior on the part of Mr. Leech at any time, including the night he died. No witness testified that they thought Mr. Leech was intoxicated, under the influence of drugs, incapacitated, or depressed on the evening of May 20-21. The first indication that Mr. Leech was upset came 14 minutes before Cotton called 911, when Mr. Leech told James that he was sorry.

The window opening through which Mr. Leech jumped or fell was 56 inches in height, and the sill was 24 inches above the floor. An HVAC unit was installed directly below the window and protruded 10 to 12 inches into the room. The window could be opened to a width of 26 inches. La Quinta required window stops to prevent guest windows from being opened wider than six inches, unless the stops were disengaged by an adult. The window in Room 721 lacked window stops.

In her complaint, Mrs. Leech alleges alternative theories of liability, depending on whether Mr. Leech intentionally jumped to his death or whether he accidentally fell through the window. If Mr. Leech committed suicide, Mrs. Leech alleges that Cotton, acting as La Quinta's agent, negligently failed to timely intervene to prevent Mr. Leech from jumping to his death and that La Quinta failed to provide adequate staffing, safety standards, and training in responding to emergencies. The trial court denied La Quinta's motion for summary judgment, in part, to the extent Mrs. Leech travels under this theory of liability. In Case No. A07A2432, La Quinta and Cotton appeal.

If, on the other hand, Mr. Leech accidentally fell through the window, Mrs. Leech alleges La Quinta negligently maintained hazardous premises, in that the window in Mr. Leech's hotel room lacked window stops, opened to an overly large aperture, opened too low to the ground, and was situated near a tripping hazard. Finding the possibility of an accidental slip or trip and fall "purely speculative," the trial court granted La Quinta's and Cotton's motion for summary judgment, in part, to the extent Mrs. Leech travels under this theory of liability. In Case No. A07A2433, Mrs. Leech appeals.

### Case No. A07A2432

1. La Quinta and Cotton contend, inter alia, that Mrs. Leech failed to come forward with any admissible evidence to show that their allegedly negligent conduct was the proximate cause of Mr. Leech's suicide. As a result, they contend, the trial court erred in denying in part their motion for summary judgment.

To state a cause of action for negligence under Georgia law,

the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty. Thus, summary judgment is appropriate in negligence cases when, viewing all the facts and reasonable inferences from those facts in a light most favorable to the plaintiff, the evidence does not create a triable issue on the question of proximate cause. Although the question of proximate cause is ordinarily for the jury to decide, plain and indisputable cases may be decided by the court as a matter of law. In such plain cases, the inquiry is whether the causal connection between the defendant's conduct and the injury is too remote for the law to countenance a recovery.

(Citations and punctuation omitted.) *Brown v. All-Tech Investment Group*, 265 Ga. App. 889, 893 (1) (595 SE2d 517) (2003).

It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent act or omission of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

*McQuaig v. McLaughlin*, 211 Ga. App. 723, 726 (1) (b) (440 SE2d 499) (1994). "An intervening act of negligence which satisfies these conditions breaks the chain of causal connection for purposes of tort liability between the original negligence and the injury and becomes the sole proximate cause of the injury." (Citation omitted.) *Cieplinski v. Caldwell Elec. Contractors*, 280 Ga. App. 267, 275 (633 SE2d 646) (2006).

"Generally, suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability." *Dry Storage Corp. v. Piscopo*, 249 Ga. App. 898, 900 (550 SE2d 419) (2001).[2] In this case,

---

[2] Cf. *Thomas v. Williams*, 105 Ga. App. 321, 326-329 (3) (124 SE2d 409) (1962) (where the police chief in charge of the city jail left a very drunk prisoner in a small cell with matches, and a detainee died after setting his mattress on fire, the officer was not entitled to dismissal because every person is charged with the knowledge that "a man staggering drunk is incapable of exercising ordinary care for his own safety"); *Emory Univ. v. Shadburn*, 47 Ga. App. 643 (1) (171 SE 192) (1933) aff'd, 180 Ga. 595 (180 SE 137) (1935) (where a hospital patient later

assuming that Mr. Leech intentionally jumped from the window,[3] and pretermitting whether La Quinta and/or Cotton owed Mr. Leech a duty to act to prevent his suicide and breached that duty, there was an intervening act of someone other than La Quinta or Cotton sufficient of itself to cause his death. There is no evidence that Mr. Leech's suicide was triggered by anything La Quinta or Cotton did or failed to do.[4] Furthermore, although Mrs. Leech claims that Mr. Leech's suicide could have been prevented if help had reached him sooner, the undisputed evidence establishes that Mr. Leech jumped out the window only *after* help arrived. In short, Mrs. Leech's theory that La Quinta and Cotton could have prevented Mr. Leech from jumping to his death if Cotton had responded differently to the crisis is pure speculation.

Because the evidence demands a finding that Mr. Leech's act of suicide was the sole proximate cause of his death, the trial court erred in denying La Quinta's and Cotton's motion for summary judgment, to the extent Mrs. Leech alleges that they negligently failed to prevent Mr. Leech's suicide. *Dry Storage Corp. v. Piscopo*, 249 Ga. App. at 900; *Kobeck v. Nabisco*, 166 Ga. App. 652, 654 (3) (305 SE2d 183) (1983); *Appling v. Jones*, 115 Ga. App. 301 (2) (154 SE2d 406) (1967).[5]

## Case No. A07A2433

2. Mrs. Leech contends that, because there is a presumption under Georgia law in favor of accidental death and against suicide, the trial court erred in ruling that the evidence in the record demands

---

jumped out of a window, the hospital was not entitled to summary judgment because the hospital was on notice that the patient was delirious when it left the patient unsupervised).

[3] See Division 2, infra.

[4] See *Dry Storage Corp. v. Piscopo*, 249 Ga. App. at 900 (where a wrongful death plaintiff claimed the decedent killed himself because he was overwhelmingly depressed and angry about his injuries from an automobile accident, the defendant driver was entitled to summary judgment because there was no evidence that the accident caused the decedent to be in a rage or frenzy or to have an uncontrollable impulse to kill himself); *Appling v. Jones*, 115 Ga. App. 301 (2) (154 SE2d 406) (1967) (where a wrongful death plaintiff claimed the decedent killed himself because head injuries he sustained when he was struck by an automobile caused him to become mentally irresponsible and insane, the defendant driver was entitled to summary judgment where there was no evidence the decedent was incoherent or irrational between the accident and his suicide).

[5] Cf. *Sneider v. Hyatt Corp.*, 390 FSupp. 976 (N.D. Ga. 1975) (where there was evidence that the hotel was on notice that its multistory atrium had become an attractive location for suicides, that a guest who later committed suicide had suicidal tendencies, was noticeably inebriated when she checked in without luggage, and was wandering around the twenty-first floor in a confused state, and that a family member had repeatedly called the hotel for help in finding the guest, the hotel was not entitled to summary judgment on a wrongful death claim) (applying Georgia law).

a finding that Mr. Leech committed suicide. The trial court's ruling in that regard precluded recovery under Mrs. Leech's alternative theory that Mr. Leech accidentally fell through a defectively designed window. Any error in the trial court's ruling on the manner of Mr. Leech's death warrants reversal, however, only if Mrs. Leech's premises liability claim is otherwise viable. We conclude that, even assuming that Mr. Leech's death was accidental, the undisputed evidence demands a finding that Mr. Leech's knowledge of any hazard presented by the window was at least equal to that of La Quinta.

A premises owner or occupier is not liable for an invitee's injuries caused by a dangerous condition if the invitee had equal or superior knowledge of the danger and voluntarily chose to encounter the hazardous condition or failed to exercise ordinary care to avoid it. *Snellgrove v. Hyatt Corp.*, 277 Ga. App. 119, 123-124 (3) (625 SE2d 517) (2006); *Howell v. Three Rivers Security*, 216 Ga. App. 890, 892 (456 SE2d 278) (1995); *Williams v. City Ice Co.*, 190 Ga. App. 744 (2) (380 SE2d 341) (1989). Rather, as we have repeatedly held, "[t]he true basis of a proprietor's liability for personal injury to an invitee is the proprietor's superior knowledge of a condition that may expose the invitee to an unreasonable risk of harm." (Citation and emphasis omitted.) *Sunlink Health Systems v. Pettigrew*, 286 Ga. App. 339, 341 (649 SE2d 532) (2007).[6]

Here, the record established that the window in the hotel room opened to an area that was wider than Mr. Leech's shoulders and reached from knee-level nearly to the top of Mr. Leech's head. It is common knowledge that in a multistory building an unguarded opening of such dimensions and vertical placement is dangerous, given that a person walking or standing in a hotel room might stumble or lose his balance and fall. Moreover, the alleged design defect in this case presented a *potential* hazard. The final step in the creation of the actual risk to Mr. Leech was his own conduct in opening the window to the maximum width.

While a proprietor's actual or constructive knowledge of a design or construction defect is presumed,[7] this record presents no evidence from which a jury could infer that La Quinta's knowledge of the hazard was *superior* to Mr. Leech's knowledge.[8] Consequently, La

---

[6] See also *Brazier v. Phoenix Group Mgmt.*, 280 Ga. App. 67, 70-71 (1) (a) (633 SE2d 354) (2006) (accord); *Howell v. Three Rivers Security*, 216 Ga. App. at 892 (accord).

[7] *Barton v. City of Rome*, 271 Ga. App. 858, 860 (610 SE2d 566) (2005); *Freyer v. Silver*, 234 Ga. App. 243, 245 (2) (507 SE2d 7) (1998); *Robinson v. Western Intl. Hotels Co.*, 170 Ga. App. 812, 814 (1) (318 SE2d 235) (1984).

[8] We note that Mrs. Leech does not allege that the window's size and features violated any applicable building code or industry standards. See *Long Leaf Indus. v. Mitchell*, 252 Ga. App. 343, 346-347 (3) (a) (556 SE2d 242) (2001) (evidence of nonconformity with code standards may

Quinta was entitled to judgment as a matter of law, to the extent Mrs. Leech alleges that La Quinta negligently failed to prevent Mr. Leech's accidental death from falling through the open window. *Snellgrove v. Hyatt Corp.*, 277 Ga. App. at 124-125 (3); *Norman v. Jones Lang LaSalle Americas*, 277 Ga. App. 621, 627 (2) (a) (627 SE2d 382) (2006). "A grant of summary judgment must be affirmed if right for any reason, whether stated or unstated. It is the grant itself that is to be reviewed for error, and not the analysis employed." (Citation and punctuation omitted.) *Gilbert v. City of Jackson*, 287 Ga. App. 326-327 (1) (651 SE2d 461) (2007). Accordingly, although we do not adopt the trial court's analysis, which concluded that the evidence demanded a finding of suicide, we affirm the grant of summary judgment in favor of La Quinta on this claim.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Adams, J., concur.*

DECIDED JANUARY 25, 2008 — RECONSIDERATION DENIED FEBRUARY 26, 2008 AND RECONSIDERATION DISMISSED FEBRUARY 29, 2008 

*Swift, Currie, McGhee & Hiers, Lynn M. Roberson, Christopher R. Reeves*, for appellants.

*Johnson & Ward, Stanley E. Kreimer, Jr.*, for appellees.

---

be proof of a landowner's superior knowledge of a defect); *Johnson v. Kimberly Clark*, 233 Ga. App. 508, 512 (504 SE2d 536) (1998) (accord).

